AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

6/17/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

United States of America

v.

ANTONIO GUERRERO,
aka "Toni,"
   "Tony,"

Defendant.

Case No.     2:21-mj-02930-duty

FILED
CLERK, U.S. DISTRICT COURT

June 17, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ch _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 29, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Jason Malik_
Complainant's signature

Jason Malik, ATF/LAPD Task Force Officer
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     June 17, 2021

_Paul L. Abrams_
Judge's signature

City and state:   Los Angeles, California

Hon. Paul L. Abrams, U.S. Magistrate Judge, Chief
Printed name and title

AUSA: Anna Farias-Eisner – (213) 894-2170

**AFFIDAVIT**

I, Jason Malik, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Antonio GUERRERO, also known as "Tony" or "Toni" ("GUERRERO"), for a violation of 21 U.S.C. § 841(a)(1): Distribution of Controlled Substances.

2.   This affidavit is also made in support of an application for warrants to search the following:

a.   A 2017, Chevrolet Cruze, bearing California license plate 8FHZ058, registered to GUERRERO (the "SUBJECT VEHICLE"), as described more fully in Attachment A-1; and

b.   The person of GUERRERO, as described more fully in Attachment A-2.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. § 924(c) (possession, use, or carry of a firearm in furtherance of a drug trafficking crime); 18 U.S.C. § 922(a) (dealing in firearms without a license); and 18 U.S.C. § 922(g) (prohibited person in possession of a firearm or ammunition) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related, in substance, and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a sworn Task Force Officer ("TFO") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, Group II / Los Angeles Police Department ("LAPD"), Metropolitan Division Task Force.  I have been a peace officer for the LAPD for over 23 years.  My mission within this task force includes reducing gang-related and violent crime, assisting in the investigation, identification, location, and apprehension of persons that have committed crimes within the City of Los Angeles or against the United States, and utilizing proactive methods to monitor and prevent criminal activity.  I have been assigned to the Metropolitan Division / ATF Task Force for approximately 6 years.

6.    I received seven months of basic training while attending the Los Angeles Police Academy.  I have also received several specialized training blocks in narcotics and firearms.

During my time as a peace officer, I have conducted hundreds of firearm and narcotics-related investigations, including conducting surveillance at known narcotics, gang, and illegal firearm sales locations and observing the actions and methods utilized by offenders in the course of buying and selling contraband.

### III.  SUMMARY OF PROBABLE CAUSE

7.   In April 2021, a confidential informant (the "CI"), working at the direction of ATF, purchased a total of approximately three pounds of methamphetamine from GUERRERO during two separate transactions.  Specifically, on April 8, 2021, GUERRERO sold to the CI approximately 439.6 grams of methamphetamine.  On April 29, 2021, GUERRERO sold to the CI approximately 738 grams of methamphetamine.  Each of the purchases of methamphetamine from GUERRERO occurred within the SUBJECT VEHICLE.

### IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports, conversations with other law enforcement officers and the CI, and my own involvement in the investigation, I am aware of the following:

**A.   Background and September 12, 2019, Controlled Purchase of Methamphetamine**

9.   On or about April 6, 2021, I spoke with the CI,[1] and LAPD Officer Henry Merin, who informed me of the following:

---

[1] The CI is being compensated financially for the CI's assistance in this investigation.  The CI has no prior arrests

a.   On or about September 12, 2019, the CI, working at the direction of LAPD Southeast Division, Narcotics Enforcement Detail, spoke with a person known as "Pedro" near the intersection of 88th Street and Vermont Avenue, in the City of Los Angeles.  "Pedro" informed the CI of a person who he knew was selling methamphetamine.  During this meeting, "Pedro" told the CI that he was calling his supplier and the supplier would deliver methamphetamine.  A short time later, the SUBJECT VEHICLE, driven by a male later identified as GUERRERO, arrived to 88th Street and Vermont Avenue.  The CI gave $250 to "Pedro." "Pedro" then approached the SUBJECT VEHICLE and gave $250 to GUERRERO.  In return, GUERRERO gave approximately 28.7 gross grams of methamphetamine to "Pedro," who in turn gave the methamphetamine to the CI.

b.   According to Officer Merin, GUERRERO was identified by running the license plate of the SUBJECT VEHICLE, which was registered to GUERRERO, and by positively identifying GUERRERO's DMV photograph compared to the individual who sold the methamphetamine to the CI through Pedro.  Through further investigation, including searching DMV records, it was determined that GUERRERO appeared to live outside of the City of Los Angeles.  Based on this factor, the LAPD Narcotics Unit elected not to pursue any further investigation into GUERRERO, at that time.

---

or convictions.  The CI has been working with ATF since approximately March 2017 and has previously worked with the LAPD, Federal Bureau of Investigation, and Drug Enforcement Administration on several occasions.  The CI has consistently provided credible and reliable information.

### B. April 8, 2021: GUERRERO Sells One Pound of Methamphetamine

10. Based on my review of law enforcement reports, conversations with other law enforcement officers and the CI, and my own involvement in the investigation, I learned the following:

a. On or about April 7, 2021, the CI was in the area of 90th Street and Vermont Avenue in Los Angeles, where the CI again encountered "Pedro." During this meeting, "Pedro" called his supplier and allowed the CI to speak with him. During this conversation, the person on the phone identified himself as "Toni," gave his phone number as 213-835-7426 to the CI, and offered to sell one pound of methamphetamine to the CI for $1,650. The CI and "Toni" agreed to conduct the deal in a strip mall located near Gage Avenue and Compton Boulevard in Los Angeles. I conducted a law enforcement database query on the phone number provided by "Toni" to the CI (213-835-7426), which returned to a "Tony Guerrero."

b. On or about April 8, 2021, at approximately 1:30 p.m., I set up surveillance for the controlled purchase with LAPD Metropolitan Division, Crime Impact Team Officers and ATF Special Agents from the Los Angeles Field Office.

c. At approximately 2:00 p.m., the CI, who was equipped with audio and video recording devices, went to the agreed-upon strip mall parking lot and waited near a Starbucks. As the CI waited outside the Starbucks, the CI received a phone call from a blocked phone number. While the CI was on the phone

with the blocked phone number, LAPD Officer Mike Martinez saw
the SUBJECT VEHICLE (a white 2017 Chevrolet Cruze bearing
California license plate 8FHZ058, which is the first picture
below and was taken by the surveillance team) pull into the
Starbucks parking lot of the strip mall.  Officer Martinez
positively identified GUERRERO and observed GUERRERO as the sole
occupant in the SUBJECT VEHICLE (as seen below in the second
photograph and is a screenshot from the CI's video recording
device).  A license plate query confirmed the SUBJECT VEHICLE
was registered to GUERRERO at 1347 East 62nd Street, Los
Angeles, California 90001.  The caller, later identified as
GUERRERO, instructed the CI to walk to the SUBJECT VEHICLE.

  

        d.    The CI walked to the SUBJECT VEHICLE and entered
through the front passenger door.  While seated in the passenger
seat of the SUBJECT VEHICLE, the CI spoke with GUERRERO.
GUERRERO handed the CI a plastic bag that contained a large
Ziplock bag containing approximately 444.1 gross grams of
methamphetamine (as seen in the third photograph above and was
taken by the surveillance team after the transaction).  The CI
then gave GUERRERO the agreed-upon amount of $1,650 for the
methamphetamine.  The two continued to talk about narcotics and

firearms.  During this conversation, GUERRERO told the CI that
his firearm supplier had just been arrested, but he would let
the CI know if he obtained a new firearm supplier.  The CI then
exited the SUBJECT VEHICLE and GUERRERO drove away.

     **C.**    **April 29, 2021: GUERRERO Sells Two Pounds of Methamphetamine**

    11.  Between April 15 and 29, 2021, the CI and GUERRERO
exchanged a series of text messages, and GUERRERO communicated
with the CI from the phone number 213-835-7426.  During these
text conversations, GUERRERO offered to sell a handgun and two
pounds of methamphetamine to the CI.  One of the text messages
sent by GUERRERO to the CI was a photograph that showed a person
holding what appeared to be a firearm (as seen in the below
photograph).  The CI and GUERRERO agreed to do the deal on April
29, 2021, for two pounds of methamphetamine at $3,600 and a
handgun for $800.



12.   On April 29, 2021, at approximately 3:30 p.m., the CI, who was equipped with audio and video recording devices, once again went to the agreed-upon strip mall located near Gage Avenue and Compton Boulevard to meet GUERRERO.  The CI again waited in front of the Starbucks.

13.   At approximately 3:52 p.m., TFO John Hackman saw the SUBJECT VEHICLE enter the strip mall parking lot.  As the SUBJECT VEHICLE passed TFO Hackman, he positively identified GUERRERO as the driver and sole occupant in the SUBJECT VEHICLE (as seen in the first photograph below and is a screenshot from the CI's video recording device).  GUERRERO drove the SUBJECT VEHICLE near the Starbucks drive-through lane and stopped.

14.   The CI approached the SUBJECT VEHICLE and was told by GUERRERO that he was going to park.  After GUERRERO parked, the CI entered the SUBJECT VEHICLE through the front passenger door and began to converse with GUERRERO.

 

15.   GUERRERO handed the CI a plastic bag that contained two vacuum-sealed bags containing approximately 890 gross grams of methamphetamine (as seen in the second photograph above and was taken by the surveillance team after the transaction).  In return, the CI gave GUERRERO $3,600.  GUERRERO told the CI that

he did not have the firearm because his supplier had sold the firearm.  After a short conversation about narcotics and firearm deals, the CI exited the SUBJECT VEHICLE and GUERRERO drove away.

### D.   Criminal History

16.   On March 29, 2021, I reviewed a criminal history report for Antonio GUERRERO and learned that GUERRERO has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about November 7, 2007, a violation of California Penal Code Sections 664 and 459, Attempted Burglary, in the Superior Court for the State of California, County of Los Angeles, Case Number BA321491; and

b.   On or about February 24, 2009, a violation of California Penal Code Section 211, First Degree Robbery, in the Superior Court for the State of California, County of Los Angeles, Case Number VA102576.

### E.   Drug Testing

17.   On June 1, 2021, the suspected methamphetamine from the April 8, 2021, controlled purchase was analyzed by the DEA Southwest Laboratory and determined to be approximately 439.6 grams of pure methamphetamine.

18.   On June 4, 2021, the suspected methamphetamine from the April 29, 2021, controlled purchase was analyzed by the DEA Southwest Laboratory and determined to be approximately 738 grams of pure methamphetamine.

## V.  **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

19.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence and vehicles.  Drug
traffickers often keep records of meetings with associates,
customers, and suppliers on their digital devices and in their
residence, including in the form of calendar entries and
location data.

        e.    Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

        f.    Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate
on a cash basis.  Such currency is often stored in their
residences and vehicles.

        g.    Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in their vehicles, or in safes.  They also often keep other
items related to their drug trafficking activities at their
residences and in their vehicles, such as digital scales,
packaging materials, and proceeds of drug trafficking.  These
items are often small enough to be easily hidden and thus may be

kept at a drug trafficker's residence even if the drug
trafficker lives with others who may be unaware of his criminal
activity.

h.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

20.   From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residences or in
their vehicles, or in places that are readily accessible, and
under their physical control, such in their digital devices.  It
has been my experience that prohibited individuals who own
firearms illegally will keep the contact information of the
individual who is supplying firearms to prohibited individuals
or other individuals involved in criminal activies for future
purchases or referrals.  Such information is also kept on
digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

21.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

> c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

> d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

24.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GUERRERO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GUERRERO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

17

## VIII.    **CONCLUSION**

26.  For all of the reasons described above, there is probable cause to believe that Antonio GUERRERO has committed a violation of 21 U.S.C. § 841(a): Distribution of Controlled Substances.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT VEHICLE described in Attachment A-1 and the person of GUERRERO described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this  17th  day of  June      , 2021.


_____
THE HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE, CHIEF